IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORAD
Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-01466-MSK

JEFFREY R. BOND,

    Plaintiff,

v.

NANCY BERRYHILL, Acting Commissioner of the Social Security Administration,

    Defendant.

**OPINION AND ORDER REVERSING DENIAL AND AWARDING BENEFITS**

**THIS MATTER** comes before the Court as an appeal from the Commissioner's Final Administrative Decision ("Decision") determining that Jeffrey R. Bond is not disabled within the meaning of §§216(i) and 223(d) of the Social Security Act. Having considered all of the documents filed, including the record **(#12)**, the Court now finds and concludes as follows:

**JURISDICTION**

The Court has jurisdiction in this matter pursuant to 42 U.S.C. § 405(g).

Mr. Bond sought disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act based on mental and physical impairments that rendered him unable to work as of May 19, 2008. The state agency denied his claim. He requested a hearing before an Administrative Law Judge ("ALJ"), who issued an unfavorable decision. Upon appeal to the Appeals Council, the matter was remanded. The same ALJ held a second hearing and again issued an unfavorable decision. Mr. Bond again appealed to the Appeals Council, which reversed the decision and ordered that Mr. Bond's claim be assigned to

1

a new ALJ.

A second ALJ held a hearing on Mr. Bond's claim and issued an unfavorable decision. Mr. Bond appealed to the Appeals Council, which denied his request for review, making the ALJ's determination the final decision of the Commissioner. Mr. Bond timely appealed to this Court.

## STATEMENT OF FACTS

The Court offers a brief summary of the facts here and elaborates as necessary in its analysis.

Mr. Bond was born on November 19, 1981. He has a limited education and work history, having obtained his GED, attended community college for a few semesters, and worked as a technician assembling air conditioners, a bus boy at a restaurant, and a sandblasting technician at a power plant. He contends that narcolepsy, cataplexy, and depression prevent him from working.

According to Mr. Bond, while working as a technician assembling air conditioners, he began having what he initially described as seizures. When he gets comfortable, sees a pretty girl, encounters heights, experiences anxiety, laughs, or is otherwise excited, he feels weak, feels like he is dreaming, and cannot move his limbs. He experiences these episodes up to three times each day. He has also been diagnosed with depression and takes medication to treat it.

**Treatment and Opinions by Treating Medical Professionals**

Mr. Bond was treated from September 3, 2008 to October 21, 2013 by a sleep specialist, J.F. Pagel, M.D., who diagnosed him with narcolepsy and cataplexy. Dr. Pagel provided four separate opinions. In the January 25, 2010 opinion, Dr. Pagel stated that Mr. Bond suffered from daytime sleepiness and narcolepsy but did not address how it would affect Mr. Bond's physical

capabilities. On February 2, 2010, again Dr. Pagel diagnosed Mr. Bond with narcolepsy and cataplexy and stated that Mr. Bond would likely miss three days each month for work, Mr. Bond would need unscheduled work breaks once or twice a day for ten minutes because of drowsiness, and that fatigue, pain, or weakness caused by Mr. Bond's condition would affect his attention and concentration. On September 21, 2011, Dr. Pagel stated that Mr. Bond's narcolepsy and cataplexy would cause him to have one to three daytime sleep attacks each day, would interfere with his attention and concentration, and would cause him to miss work once or twice each month.  Finally, on January 9, 2013, Dr. Pagel stated that Mr. Bond would miss one to three days of work each month and would need one hour rest breaks once or twice each day and that these limitations on Mr. Bond's ability to work had existed since October 2008.

**Opinions by Non-treating Medical Professionals**

Jose Vega, Ph.D. performed a mental status evaluation of Mr. Bond on January 21, 2013. He opined that Mr. Bond suffered from moderate to extreme limitations on his understanding and memory, his ability to sustain concentration and persistence, his ability to interact with the general public, supervisors, coworkers, and peers, and his ability to adapt to changing circumstances. Further, based on Mr. Bond's statements, he opined that Mr. Bond's limitations existed since 2008.

On November 6, 2009, James J. Wanstrath, Ph.D. reviewed Mr. Bond's file but did not examine him. He noted that Mr. Bond suffered from depression and claustrophobia. However, he opined that there was insufficient evidence to find that these conditions caused any limitations on Mr. Bond's mental functioning.

Ian Happer, M.D. also reviewed Mr. Bond's file but did not examine him. On November 2, 2009, Dr. Happer stated that Mr. Bond should not be employed in jobs involving "unprotected

3

heights, dangerous machines or commercial driving". However, he did not address whether Mr. Bond would need unscheduled work breaks or whether his symptoms would affect his attention or concentration at work.

Ronald Devere, M.D. reviewed Mr. Bond's file and listened to his testimony during a hearing on October 30, 2014, but did not examine Mr. Bond. After listening to Mr. Bond's testimony, he testified,

> [Mr. Bond] shouldn't work with any moving machinery or using pedals in the job. He shouldn't be driving … trucks or anything, or even a car. He could sit at least six hours a day, he should be able to stand an hour at least, and walk an hour a day, based on his limitation. He wouldn't have any restriction in using his arms above his shoulder or at level as far as finger, feeling, and all that. He should be able to lift 15 pounds occasionally, and five pounds frequently.

However, Dr. Devere expressed no opinion as to whether Mr. Bond would need unscheduled work breaks or whether his narcolepsy and/or cataplexy would affect his attention or concentration at work.

**Opinion by Vocational Expert**

Dennis Duffin, a vocational expert, testified at the October 30, 2014 hearing. The ALJ presented Mr. Duffin with the following hypothetical:

> Mr. Duffin, I'm going to pose a hypothetical to you. And this hypothetical person will be about the claimant's age of 32, have a GED, and a similar vocational profile as an assembly tech, because that was the past relevant work. If this hypothetical were able to occasionally lift and/or carry up to 15 pounds, and frequently lift and/or carry up to five pounds; can stand and/or walk in combination for two hours out of an eight-hour workday; can sit for about six hours out of an eight-hour workday; should never climb ladders; can occasionally climb stairs; and can frequently balance, stoop, kneel, crouch, and crawl; but should not engage in commercial driving; should not work ever at unprotected heights or in close proximity to hazardous machinery.

Based on this hypothetical, Mr. Duffin opined that the hypothetical person could not perform the work of an assembly technician but could work as an appointment clerk, telemarketer, document preparer, and lens block gauger.

Mr. Bond's attorney then examined Mr. Duffin. He asked whether the employers of the above-listed jobs would "allow an individual to, on an unpredictable basis once to three times per day, be off task for 10 minutes at a time". Dr. Duffin replied that they would not.

## THE ALJ'S DECISION

The ALJ analyzed his case pursuant to the sequential five-step inquiry. At step one, the ALJ found that Mr. Bond had not worked or engaged in substantial gainful activity from the alleged onset date of May 19, 2008. At step two, the ALJ found Mr. Bond had medically severe impairments of narcolepsy and cataplexy. At step three, the ALJ found that Mr. Bond's impairments did not equal the severity of a listed impairment in the appendix of the regulations. At step four, the ALJ first assessed Mr. Bond's Residual Functional Capacity ("RFC") and determined,

> [T]hrough the date last insured, [Mr. Bond] had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that[he]: could frequently lift and carry up to five pounds and occasionally up to 15 pounds; could walk and stand in combination up to two hours in an eight-hour work day; could sit up to six hours in an eight hour work day; could not climb ladders; could occasionally climb stairs; could frequently balance, stoop, kneel, crouch and crawl; could not do any commercial driving, and required no exposure to unprotected heights or hazardous machinery.

The ALJ then found that Mr. Bond could not perform his past relevant work. However, at step five, the ALJ found that Mr. Bond could perform jobs that exist in significant numbers in the national economy, and thus, he was not disabled.

## ISSUES PRESENTED

Mr. Bond raises four objections to the ALJ's decision: (1) the ALJ erred in finding that Mr. Bond possesses the residual functional capacity to perform other work that exists in significant numbers in the national economy; (2) the ALJ failed to follow Dr. Devere's restrictions with sufficient precision, even though she gave his opinion substantial weight; (3) the

ALJ did not properly assess Mr. Bond's mental impairments, (4) the ALJ improperly assigned Dr. Pagel's opinion less weight than that of Dr. Devere; and (5) the ALJ improperly assessed Mr. Bond's limitations resulting from his narcolepsy and cataplexy. The Court only addresses the fourth of these objections inasmuch as it is dispositive.

## STANDARD OF REVIEW

On appeal, a reviewing court's judicial review of the Commissioner of Social Security's determination that claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the Commissioner's decision is supported by substantial evidence. *Hamilton v. Sec'y of Health &Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992); *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990); *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). If the ALJ failed to apply the correct legal standard, the decision must be reversed, regardless of whether there was substantial evidence to support factual findings. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). In determining whether substantial evidence supports factual findings, substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown*, 912 F.2d at 1196; *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires more than a scintilla but less than a preponderance of the evidence. *Lax*, 489 F.3d at 1084; *Hedstrom v. Sullivan*, 783 F. Supp. 553, 556 (D. Colo. 1992). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Although a reviewing court must meticulously examine the record, it may not weigh the evidence or substitute its discretion for that of the Commissioner. *Id.*

**ANALYSIS**

Mr. Bond argues that the ALJ should have given Dr. Pagel's opinion controlling weight and did not provide adequate justification for failing to do so, choosing instead to give it little weight and Dr. Devere's opinion great weight. The Commissioner argues that the ALJ provided adequate justification for doing so.

A treating physician's opinion must be given controlling weight if (1) it is well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) it is consistent with the other substantial evidence in the record. *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). If either of these requirements is not satisfied, then the opinion is not accorded controlling weight. To give a treating provider's opinion less than controlling weight, the ALJ must give specific and legitimate reasons. *Drapeau v. Massanri*, 255 F.3d 1211 (10th Cir 2001). This requires that the ALJ be specific in describing how the opinion is unsupported by clinical and laboratory diagnostic techniques, or identify how it is inconsistent with substantial evidence in the record. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

If a treating physician's opinion is not given controlling weight, its relative weight must be assessed in comparison to other medical opinions in the record. The factors considered for assessment of weight of all opinions are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Allman v. Colvin*, 813 F.3d 1326, 1331–32 (10th Cir. 2016). None of these factors are controlling; not all of them apply to every case, and an ALJ need not expressly discuss each factor in his or her decision. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However,

"the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen v. Astrue*, 319 Fed. App'x 712, 718-19 (10th Cir. 2009)(*emphasis* in original). Finally, just as when an ALJ determines whether to give a treating provider's opinion controlling weight, the ALJ must provide legitimate, specific reasons for the relative weight assigned. *Langley*, 373 F.3d at 1119.

As noted above, Dr. Pagel opined that Mr. Bond's narcolepsy and cataplexy would cause him to miss up to three days of work each month, would require him to take up to two unscheduled rest breaks each day, and would affect his attention and concentration. He further opined that these limitations had existed since October 2008. The ALJ gave these opinions little weight stating, "Although Dr. Pagel is a treating provider, and a sleep specialist, his opinion is not consistent with his own treatment records, which do not show any abnormal clinical findings as he did not complete any objective evaluations."

The ALJ did not expressly address the first step of assessment of a treating provider's opinion – whether it is well supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the record. This is legal error, but it is harmless if other findings by the ALJ satisfy the required inquiry. Unfortunately, they do not.

There is no express finding that Dr. Pagel's opinion was not premised on medically acceptable clinical and laboratory diagnostic techniques. Indeed, to the contrary, the ALJ accepted results from testing conducted at Dr. Pagel's direction and interpreted by Dr. Pagel. On September 2 and 3, 2008, under Dr. Pagel's direction, Mr. Bond underwent a Polysomnography Test ("PSG") and a Multiple Sleep Latency Test ("MSLT"). R. 762-65. In interpreting the MSLT, Dr. Pagel stated, "[Mr. Bond] has four sleep onset REM periods,

indicating this is a very positive study for the diagnosis of narcolepsy. [He] requires counseling and treatment for an underlying case of narcolepsy. [He] should not drive when sleepy. Activating medications are definitely indicated." R. 762. The ALJ acknowledged the MLST as demonstrating that Mr. Bond suffers from narcolepsy and cataplexy:

> A multiple sleep latency test (MLST) performed in September 2008 revealed findings consistent with severe hypersomnolence and narcolepsy (Exh. 9F, p.10) The MLST findings may account for the claimants complains(sic) of cataplexy.

R. 290.

With regard to whether a treating physician's opinion is inconsistent with the substantial evidence in the record, the ALJ must specifically identify "those portions of the record with which [the treating physician's] opinion was allegedly inconsistent." *See Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011). This Decision fails to specify any examples of inconsistency between Dr. Pagel's opinion and substantive evidence in the record. It merely states that Dr. Pagel's opinion is inconsistent with his own treatment records. Even if Dr. Pagel's records might be considered "substantial evidence in the record", there is no identification of any specific inconsistency, which prevents meaningful review.

Finding that the ALJ failed to demonstrate application of the proper legal framework for addressing the opinion of a treating physician, the Commissioner's determination must be reversed.

When faced with deficient findings of fact by the Commissioner, the Court has the option to either remand the matter for additional factfinding or to simply direct an award of benefits. *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993). In deciding how to exercise that discretion, the Court considers the length of time the matter has been pending and whether, given the available evidence, a remand for further factfinding would serve any useful purpose or

whether it would simply delay the receipt of benefits. *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006). The Court will not direct an award of benefits unless the administrative record has been fully developed and substantial and uncontradicted evidence in the record indicates that the claimant is entitled to benefits. *Brockway v. Astrue*, 781 F.Supp.2d 1145, 1154 (D. Colo. 2011).

The Court notes that this application is more than 8 years old. First filed on March 19, 2009, it has been considered by in three hearings by two ALJs. Denial decisions have been reversed twice by the Appeals Council. The current denial Decision is reversed, not for lack of adequate fact finding, but instead for legal error – failure to apply long-standing, clear precepts for evaluating the opinions of treating physicians.

There does not appear to be any need for further fact-finding. The critical issue is framed by Mr. Bond's attorney when he asked the vocational expert whether his opinion as to available jobs that Mr. Bond could perform would change if he was off task "on an unpredictable basis once to three times per day, …for 10 minutes at a time." The VE's response was that the jobs identified could not be performed under such conditions.

Dr. Pagel, a treating physician, opined as to this limitation on February 2, 2010 and September 21, 2011. In 2010, he stated that Mr. Bond's narcolepsy and cataplexy would require Mr. Bond to take unscheduled work breaks once or twice a day for ten minutes because of drowsiness. In 2011, he opined that Mr. Bond's narcolepsy and cataplexy would cause him to have one to three daytime sleep attacks each day. There is no evidence of record that directly contradicts these opinions. Indeed, Dr. Devere stated that it is "well documented in the sleep study" that Mr. Bond may experience weakness and fall down because of his condition. R. 331.

Dr. Devere also testified that Mr. Bond should not climb ladders or scaffolds, drive, work with moving machinery, or use pedals. R. 333.

Additionally, reviewing Dr. Pagel's treatment records, Mr. Bond had significant problems treating his narcolepsy and cataplexy during the relevant time period. On November 13, 2008, Mr. Bond reported that he was not doing well on his prescribed medications: he was not sleeping well on Xyrem; Zoloft was giving him diarrhea; and Provigil was making him shaky. R. 194. On June 16, 2009, Dr. Pagel observed that Mr. Bond was "almost dysfunctional." R. 761. On March 3, 2010, Mr. Bond reported that he was having cataplexy attacks, was not sleeping, and was "feeling almost incapacitated from his narcolepsy." R. 759. On June 16, 2010, Mr. Bond reported that he had three cataplexy attacks each week. R. 758. On January 12, 2011, Mr. Bond reported that he was having three cataplexy attacks each day, and Dr. Pagel observed that Mr. Bond "is quite dysfunctional with known severe narcolepsy." R. 757.

However, Dr. Pagel's treatment records from April 2, 2009 and December 16, 2009 show that Mr. Bond's symptoms can be well-managed through a combination of Xyrem, Provigil or Adderall, and Prozac. R. 191, 770. In fact, he only reported problems when he was not taking this combination of drugs. *See* R. 194, 757-761. But Dr. Pagel's treatment records show that Mr. Bond was unable to obtain the medications he needed to manage his symptoms because of their cost. On June 16, 2009, Mr. Bond reported that he could not afford to fill his Provigil prescription, and Dr. Pagel substituted Adderall for it. R. 761. On December 16, 2009, Mr. Bond reported that his insurance changed, and the cost of Xyrem increased to $700 for one month's supply. R. 770. On March 3, 2010, Mr. Bond reported that his co-pay for Xyrem had decreased to $150 per month but that he still could not afford it. R. 759. On April 19, 2011, he reported that he was "having daily cataplexy attacks", and Dr. Pagel observed, "My major concern is that

11

Xyrem is required because of [Mr. Bond's] severe cataplexy attacks and his diagnosis of narcolepsy; otherwise we are having extreme difficulty controlling these events." R. 756. When a claimant lacks the financial ability to obtain necessary medications, his failure to take the medications cannot be imputed against him when determining whether he is disabled. *See Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988); *Klein v. Colvin*, 25 F. Supp. 3d 1338, 1344 (D. Colo. 2014); *Ky v. Astrue*, 08-cv-00362, 2009 WL 68760, *4 n.4 (D. Colo. Jan. 8, 2009).

No purpose is served in remanding this matter. There is no retrospective factfinding to be done and no evidence contradiction of Dr. Pagel's assessment that Mr. Bond would need one to three unscheduled breaks of at least 10 minutes each day. According to the vocational expert, Mr. Duffin, this limitation precludes Mr. Bond from engaging in any meaningful work. Thus the Court finds that Mr. Bond is entitled to an award of benefits. Inasmuch as it has determined that Mr. Bond is entitled to an award of benefits, the Court need not address his remaining arguments. *See Madrid v. Barnhart*, 447 F.3d 788, 792 (10th Cir. 2006).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision to deny Mr. Bond's claim for disability benefits is **REVERSED**, and this matter is **REMANDED** for an award of benefits consistent with this order. The Clerk shall enter a judgment in this matter.

**Dated this __13th__ day of December, 2017**

**BY THE COURT:**

*Marcia S. Krieger*

Marcia S. Krieger
United States District Court